IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

RAYMOND A. CONTRERAS, §
§
    Plaintiff. §
§
v. § No. SA-10-CA-846-H
§
AT&T SERVICES, INC. AND §
AT&T PENSION BENEFIT PLAN, §
§
    Defendants. §

**MEMORANDUM OPINION AND ORDER**

This is a civil action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132. Both parties have filed motions for summary judgment. Having reviewed the motions and the responses, the Court finds that Defendants are entitled to judgment in their favor as a matter of law.

**I. INTRODUCTION**

The following facts are established by the administrative record: Plaintiff was employed by Southwestern Bell Telephone Company (SWBT) from July 25, 1982 until June 24, 1988. He was then employed by Pac Bell Directory (Pac Bell) from July 6, 1988 until October 11, 1994. SWBT and Pac Bell were covered by a Mandatory Portability Agreement (MPT) that allowed for mutual recognition of pension benefits among eligible employees of companies formed as a result of the break up of American Telephone & Telegraph in 1984. Pursuant to the MPT, Plaintiff ported his service with SWBT to Pac Bell's pension plan — the Pacific Telesis Group Pension Plan (Pac

Bell Plan). When his employment with Pac Bell ended, he received a lump-sum distribution from the Pac Bell Plan in the amount of $32,464.12.

On January 2, 1996 Plaintiff went to work for Southwestern Bell Yellow Pages (Yellow Pages). Four months later, Plaintiff received a letter from Yellow Pages' plan administrator, Fidelity Investments, indicating that he was eligible to port his prior service under the Pac Bell Plan into the Yellow Pages' plan, but had an option to waive portability if he desired (Def. Ex. B at ATTPBP 16). Attached to the letter was an explanation of his portability options. After reviewing the letter, Plaintiff declined to waive portability (Def. Ex. B at ATTPBP 19).

Plaintiff requested and received estimates of his pension benefits in October, 2006 and December, 2006. Both estimates calculated his benefit estimate using his initial hire date with SWBT — July 25, 1982 and both estimates stated that he would be entitled to a lump-sum distribution of over $500,000 (Def. Ex. B at ATTPBP 185-86, 191-92). In January, 2007 Plaintiff retired with Yellow Pages and requested a lump-sum distribution of his pension benefits.

On March 14, 2007, Contreras claims that he received a call from the plan administrator notifying him that the final calculation of his lump-sum pension payment was $219,808.60 (Def. Ex. B at ATTPBP 46). This amount was calculated using his initial

employment date with Yellow Pages - January 2, 1996 - rather than his initial employment date with SWBT.

Plaintiff initiated a formal claim with Fidelity on January 24, 2008. (Def. Ex. B at ATTPBP 43-46). In it, he requested that his pension benefit be calculated using his initial hire date with SWBT (Def. Ex. B at ATTPBP 46). His 1995 lump-sum payout, he argued, should be accounted for by subtracting the amount of the payout from his pension benefit for 24 years of service (Def. Ex. B at ATTPBP 46). His claim was denied on July 3, 2008 (Def. Ex. B at ATTPBP 49-53). In the denial, citing Section 8.2.3(c) of the SBC Pension Benefit Plan - Bargained Program (the Plan), Fidelity concluded that Plaintiff was not entitled to credit for his service before 1996 because he had received a lump-sum payout and had not returned it, as is required by the plan (Def. Ex. B at ATTPBP 50).

Plaintiff appealed the decision to the Benefit Plan Committee on August 8, 2008 (Def. Ex. B at ATTPBP 1-4). The Committee denied his appeal on March 25, 2009, concluding that repayment of his distribution under the Pac Bell Plan was required if he desired to have his prior Pac Bell service recognized for purposes of calculating his pension benefit (Def. Ex. B at ATTPBP 1-4). The committee concluded that, although the mistaken estimates did not alter the benefit plan, Plaintiff should be given the option to re-instate his employment (Def. Ex. B at ATTPBP 4). Plaintiff declined the offer. This completed the appeal process.

## II. APPLICABLE LAW

When a plan grants an administrator discretion to construe the terms of the plan, the Court is required to apply an abuse of discretion standard. **Sanders v. Unum Life Ins. Co. Of Am.**, 553 F.3d 922, 925 (5th Cir. 2008). Here, the plan delegates authority to the Fidelity Services Center to determine initial claims and to the Benefit Plan Committee to decide appeals so the abuse of discretion standard applies (SBC Pension Benefit Plan, Def. Ex. C at 9).

The Court employs a two-step approach in determining whether an administrator's interpretation was an abuse of discretion. **Gosselink v. American Tel. & Tel., Inc.**, 272 F.3d 722, 726 (5th Cir. 2001). Under this approach, the Court must first determine whether the administrator's interpretation of the plan was legally correct. **Id.** In determining whether the interpretation is legally correct, the Court must consider (1) whether the administrator has given the plan a uniform construction; (2) whether the administrator's interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. **Id.** If the Court concludes that the administrator's interpretation is not legally correct, it must then determine whether the administrator abused its discretion. **Id.** In determining abuse of discretion, the court must consider (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the

appropriate administrative agencies; and (3) the factual background of the determination and any inference of lack of good faith. **Id.**

Factual findings underlying a claim decision are always reviewed under an abuse of discretion standard. **Love v. Dell Inc.**, 551 F.3d 333, 336 (5th Cir. 2008). The abuse of discretion standard requires the Court to determine whether the administrator's factual findings were "arbitrary and capricious." **Id.** An administrator's findings of fact are arbitrary and capricious when there is not a "rational connection between the known facts and the decision or between the found facts and the evidence." **Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.**, 97 F.3d 822, 828 (5th Cir. 1996). An administrator's decision to deny benefits must be based on evidence that clearly supports the basis for denial. **Vega v. Nat'l Life Ins. Servs., Inc.**, 188 F.3d 287, 299 (5th Cir. 1999).

### III. ANALYSIS

Because the Plan vests in the Benefit Plan Committee discretion in determining coverage, the Court will review its findings using an abuse of discretion standard. The parties disagree primarily about whether the Plan requires that an employee who was previously employed by an MPA Interchange Company, and who received a lump-sum distribution upon termination of his employment, return his distribution in order for his years of service prior to the distribution to count toward his pension calculation.

Section 8.2.3(a) of the Plan provides:

> If a Covered Employee receives a lump sum distribution under Subsection 6.14 or Paragraph 10.4.8 of the SBCPBP-Nonbargained Program and is subsequently employed by an MPA Interchange Company, such Covered Employee may repay to the Pension Fund within one year after the date he begins such MPA Interchange Company employment, the total amount of the lump sum distribution, plus interest.

(Def. Ex. C at 83). Section 8.2.3 (c) provides:

> If any Covered Employee is employed by an SBC MPA Company after terminating employment with an MPA Interchange Company and subsequent to receipt of a lump sum distribution of his accumulated benefit under such MPA Interchange Company's Pension Plan, the portion of such Covered Employee's Pension Service Credit constituting benefit accrual service shall not be recognized under the Plan unless and until such Covered Employee repays such lump sum distribution to such MPA Interchange Company Pension Plan in accordance with the terms and conditions of and within the time period provided in such plan and not until the assets associated with such repayment have been transferred to the SBCPBP and the Pension Fund.

(Def. Ex. C at 83). Fidelity, in its claim denial, and the Benefit Plan Committee, in its appeal denial, relied on these provisions to conclude that Plaintiff was ineligible to use his pre-1994 service in calculating his pension benefit because he had failed to repay the lump sum distribution he received in 1995 (Def. Ex. B at 0004, 0050). Plaintiff contends that this conclusion was an abuse of discretion. The Court must first consider whether the administrator's interpretation of the plan was legally correct before determining whether it was an abuse of discretion. **Gosselink**, 272 F.3d at 726. Because Plaintiff does not claim that the administrator's construction of the Plan is not uniform, and because unanticipated costs are not at issue, the Court will focus

-6-

solely on whether the administrator's interpretation is consistent with a fair reading of the plan. **Id.**

## A. The Plan

Plaintiff first argues that the administrator erred by either misinterpreting Plan provisions or failing to recognize ambiguities in the Plan. He cites various sections governing claim distribution that do not require repayment of lump sum distributions and argues that they are inconsistent with the administrator's reading of Section 8.2.3. He also claims that the Plan's definitions of Pension Calculation Service (Calculation Service) and Pension Eligibility Service (Eligibility Service) are inconsistent with one another and render the Plan ambiguous.

"Pension Calculation Service" is the period of employment used to determine the amount of a Participant's pension benefits (Definitions and Rules for Crediting Service, Def. Ex. D at 12). Section 2.63.4 provides that, "[n]otwithstanding any other provision of the Plan," Pension Calculation Service does not include periods of employment with an Interchange Company "if the Covered Employee has received a lump sum distribution of his pension benefit . . . and the Eligible Employee has not repaid the lump sum distribution" (Def. Ex. D at 12). "Pension Eligibility Service" is the period of employment used to determine eligibility for pension benefits (Def. Ex. D at 13). Section 2.64.1 of the Plan provides that Pension Eligibility Service includes periods of

employment at a Interchange Company "notwithstanding the repayment of any lump sum distribution made to such Covered Employee" (Def. Ex. D at 13). Plaintiff argues that these definitions conflict and create a substantial ambiguity. Plaintiff does not produce a reason, and the Court can think of none, that two different terms having different definitions should be considered an ambiguity. That Plaintiff's employment before 1994 is part of his Eligibility Service is not disputed. What is in dispute is whether it also qualifies as Calculation Service. That Eligibility Service inclusion does not require repayment of earlier payouts does not make the definition of Calculation Service ambiguous.

Plaintiff also argues that the administrator's interpretation of the plan was incorrect because it ignored Sections 3.2.3(b), 3.5, 4.1.1 and 6.1.3(a), which he claims contradict Section 8.2.3 because they do not require repayment of lump sum pension payouts.

Section 3.2.3(b) provides that "[n]otwithstanding any other provision of this Section 3," an absence of over six months "shall not be a break in his Pension Eligibility Service and Pension Calculation Service, or Pension Eligibility Service only, as applicable" if the employee works for five years after returning. Plaintiff argues that because this "bridging" rule does not require repayment of any pension benefits received during the absence, his accrued Calculation Service was automatically "bridged" after five years. The administrator, therefore, incorrectly interpreted the

Plan when it determined that repayment was required for his prior service to be included in Calculation Service. The Court finds this argument unpersuasive. Section 2.63.4 defines Calculation Service as excluding service for which a lump sum pension payment has been received and not returned (Def. Ex. D at 12). While the bridging rule does apply whether or not there has been an unreturned payout (and, in fact, has undisputedly been applied to Plaintiff's Eligibility Service), the employment period Plaintiff seeks to include as Calculation Service is explicitly excluded from the definition of Calculation Service by the Plan (Def. Ex. D at 12).

Section 3.5 prohibits reductions in determinations of pension benefits over time (def. Ex. D at 24). Plaintiff does not specify how this provision applies to him or why its application contradicts the administrator's findings. At issue in this case is whether the administrator miscalculated Plaintiff's pension amount by failing to recognize prior years of service. Because there is no indication that there was a reduction in benefit amount, the administrator's failure to apply Section 3.5 in Plaintiff's favor was not inconsistent with a fair reading of the Plan.

Section 4.1.1 is a provision governing Eligibility Service and "Years of Vesting Service" accrued prior to January 1, 1984 (Def. Ex. D at 26). Nothing in the language of the Plan or in Plaintiff's arguments indicates that Section 4.1.1 applies to Calculation Service. Neither Plaintiff's Eligibility Service nor his Years of

Vesting Service are at issue in this case. Not applying this rule to require Defendant to use Plaintiff's pre-payout service to calculate his pension benefit was not inconsistent with a fair reading of the Plan.

Section 6.1.2(a) provides that, where both the Mandatory Portability Agreement (MPA) and the Divestiture Interchange Agreement (DIA) could apply to an employee, the DIA will apply (Def. Ex. D at 143). Plaintiff does not argue that he is covered by the DIA or present any evidence of how the DIA might change his benefit calculation. The Court cannot conclude, based only on the existence of this rule, that the administrator's decision was legally incorrect.

### B. The Summary Plan Description

ERISA requires plan administrators to provide their participants with an accurate and comprehensive summary of their benefit plan. 29 U.S.C. § 1022(a). The Summary Plan Description (SPD) is intended to simplify the language of a plan, allowing the average participant to understand his rights and duties. **Fallo v. Piccadilly Cafeterias, Inc.**, 141 F.3d 580, 583 (5th Cir. 1998). Because it is merely a summary and cannot contain every term of a plan, omission of certain terms from the SPD will not alter the governing plan. **Id.** at 584 n.20. If, however, the terms of the SPD conflict with the plan, the SPD controls. **Id.** at 583-84. Ambiguities in the SPD are resolved in favor of the participant.

**Id.** at 584.

Plaintiff argues that the administrator's decision was incorrect because the SPD and the Plan are inconsistent. The SPD defines the term "Net Credited Service" as having the same meaning as Pension Eligibility Service and Pension Calculation Service — it is "an employee's period of continuous employment in any SBC Company while that company participates in this Plan" (Summary Plan Description, Def. Ex. E at 22). It states that the term "may also include service with an Interchange Company" (Def. Ex. E at 22). Plaintiff contends that the SPD's definition of Net Credited Service gives Pension Eligibility Service and Pension Calculation Service the same meaning. Consequently, it conflicts with the Plan, which gives Pension Eligibility Service and Pension Calculation Service different definitions. Because of this conflict, Plaintiff argues, the SPD, rather than the Plan, should govern his benefit eligibility. The administrator's interpretation of the Plan was an abuse of discretion, Plaintiff contends, because the SPD exclusively uses the term "Net Credited Service" when discussing benefit calculations and defines Net Credited Service to include service at an Interchange Company.

The Court finds this argument unpersuasive. Reading the SPD and the Plan together reveals that there is no inconsistency between the documents. While the SPD does omit the details of when a former Interchange Company employee's service will count toward

his pension amount, this omission does not alter the Plan. **Fallo**, 141 F.3d at 584 n.20. Importantly, the SPD never represents that prior service at an Interchange Company will be included in Net Credited Service. Rather, it provides that Net Credited Service includes periods of continuous employment with a SBC Company and **may** include service with an Interchange Company (Def. Ex. E at 22). Furthermore, the SPD does not provide that Pension Eligibility Service and Pension Calculation Service have the same meaning in the Plan, but that the term "Net Credited Service" encompasses both terms (Def. Ex. E at 22). In the section explaining transfer of benefits from an Interchange Company, the SPD urges employees to contact the Benefit Organization "regarding special rules that may apply to [them]" (Def. Ex. E at 17). In discussing coverage under Interchange Agreements, the SPD indicates that service with an Interchange Company "**may** be recognized as Net Credited Service . . . depending upon the agreement and your personal situation" (Def. Ex. E at 19)(emphasis added).

While it is true that when an SPD conflicts with a plan, the SPD will govern a participant's benefit eligibility, the same does not apply when an SPD is silent. **Fallo**, 141 F.3d at 583, 84 N.20. A summary, by definition, will not contain every detail of the thing it summarizes. The SPD indicates that Net Credited Service **may** include service at an Interchange Company, but that transfer of such service is governed by special rules and depends on the

-12-

participant's individual situation. While the SPD does not outline the rules governing transfer of pension benefits from an Interchange Company, none of its representations are inconsistent with the Plan. Because there is no inconsistency between the SPD and the Plan, the Court finds that the administrator's interpretation was not legally incorrect.

### C. The Explanation of Waiver of Portability

#### i. Conflict with the Plan

Plaintiff next claims that the administrator's interpretation of the Plan is contrary to the Explanation of Waiver of Portability, a document he claims to be an official plan document. The Explanation of Waiver and Portability is a two-page document Defendants sent to Plaintiff in 1996, informing him that he was eligible to port his Pac Bell service and explaining the consequences of waiving portability. Plaintiff claims that the document contradicts the plan because it permits an offset of any lump sum pension payout and, because it is an official plan document, the terms of this document should control wherever it conflicts with the Plan. Defendants counter that the Explanation of Waiver is not an official plan document, but rather an illustrative document meant only to explain portability to participants. Plaintiff offers two arguments in support of his assertion that this document is an official plan document.

First, he claims that Defendants conceded that it was a plan

document in *Sullivan v. AT & T, Inc.*, 2010 WL 905567 (N.D. Tex). Nothing in *Sullivan* even indicates that the document at issue in that case was the same document at issue here. In fact, the document discussed in *Sullivan* had a different title: "Special Notice Regarding Portability." **Sullivan,** 2010 WL 905567 at *3. The district court only references the Special Notice Regarding Portability in answering the plaintiff's charge that he had not knowingly or voluntarily executed the waiver. **Id.** at *3. Nowhere does the district court indicate that the document at issue was official or binding on Defendants.

Plaintiff's only other argument that the Explanation of Waiver is binding against Defendants is that "[a]lthough the Explanation of Waiver of Portability may not be an actual Summary Plan Document,[1] Defendants should certain[ly] be bound by their own instructions" (Pl. Resp., Doc. 30 at 13). In support of this proposition, he cites *Washington v. Murphy Oil USA, Inc.*, 497 F.3d 453 (5th Cir. 2007), a case holding that an SPD is binding against a defendant when it contradicts the provisions in the benefit plan (Doc. 30 at 13). Plaintiff's argument is directly opposed to the Fifth Circuit's holding in *Hicks* that, "[i]f a document is to be

---

[1] Which it certainly is not. *Hicks v. Fleming Co. Inc.*, 561 F.2d 537 held that a document qualifies as an SPD if it contains all or substantially all categories of information required under 29 U.S.C. § 1022(b) and the Department of Labor's regulations at 29 C.F.R. § 2520.102-3. **Hicks,** 561 F.2d at 542. Plaintiff cannot in good faith contend that this two-page document even approaches this standard.

afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient to constitute an SPD for filing and qualification purposes." **Hicks**, 961 F.2d at 542. Plaintiff asks this Court to give a two-page explanatory document the same legal effect as an SPD. Because Plaintiff cannot show that this document meets substantially all of the requirements of an SPD, the Court finds that the administrator's failure to give any alleged variance legal effect was legally correct.

### ii. ERISA-Estoppel

Plaintiff also claims that he detrimentally relied on the representations in the Explanation of Waiver. The Explanation of Waiver states that if a participant retains any lump sum payout for prior service, that service will not be used in calculating pension amount (Def Ex. B at ATTPBP 17). It also explains that, if an employee terminates his employment after bridging, any lump-sum payout will be offset against his pension benefit (Def. Ex. B at ATTPBP 17). Plaintiff claims that he relied on the paragraph discussing offset in deciding not to waive portability. Because of this, he claims, Defendants should be bound by their purported representations that an offset would be used to calculate pension benefits.

To establish an ERISA-estoppel claim, a plaintiff must show (1) a material misrepresentation; (2) reasonable and detrimental

reliance; and (3) extraordinary circumstances. **Mello v. Sara Lee Corp.**, 431 F.3d 440, 444-45 (5th Cir. 2005). Because Plaintiff has failed to show that his reliance was reasonable or detrimental, his claim fails and this Court need not address the other elements of ERISA-estoppel.

As a preliminary matter, Plaintiff does not even allege detrimental reliance. He argues only that he relied on the Explanation of Waiver in his decision to port his prior service into the Plan (Pl. Resp., Doc. # 30 at 11). His decision to port his service resulted in his prior service being used for determining his eligibility for pension benefits. Had he decided not to port his service, as he seems to indicate he would have done if the Explanation of Waiver had not been misleading, he would have been in no better position than he is now. The only difference would be that, in that situation, his prior service would not have been used to determine his pension eligibility or his pension amount.

Even assuming that he could show detrimental reliance, Plaintiff's claim would fail because any reliance on the Explanation of Waiver would not have been reasonable. The Plan unambiguously requires return of any lump-sum payout as a prerequisite for bridged service to be used for pension calculation purposes. Plaintiff does not argue that he relied on the Explanation of Waiver to interpret an ambiguous provision in the

Plan. Rather, he argues that it was reasonable for him to rely on an informal document that contradicted unambiguous Plan terms. ERISA's policy against informal modification of plan terms precludes a finding that any such reliance was reasonable. **Id.** at 445. The Fifth Circuit has held that reliance on an informal document in the face of unambiguous Plan terms is not reasonable. **Id.** at 447. Consequently, Plaintiff's ERISA-estoppel claim fails because he cannot show that his reliance was reasonable or detrimental.

### D. The Term of Employment Summary

Plaintiff's final argument is that the Term of Employment Summary sent to him in 1996 is an official plan document and, because it contradicts the Plan, is binding on Defendants. He claims that the administrator abused its discretion when it found that Plaintiff was notified of the effect of his failure to repay the 1995 payout in a Term of Employment Summary sent to him in 1996. His notification is doubtful, he claims, because the notification language is in mysterious font and, therefore, is likely the result of modification.

This argument is completely without merit. First, Plaintiff offers the Court no reason why it should afford this one-page letter the same legal effect as a Summary Plan Document. Second, Plaintiff ignores that the administrator, in determining the facts, considered his own testimony that he had received a Term of

Employment Summary containing the "mysterious" language notifying him that his previous service would not be used to calculate his pension amount (Def. Ex. B at ATTPBP 58). The conclusion that Plaintiff did receive the "mysterious" Term of Employment Summary was not an abuse of discretion — there is a clear rational connection between the finding that he received the document and his testimony that he had received it. See **Bellaire Gen. Hosp.**, 97 F.3d at 299.

## IV. CONCLUSION

Because Plaintiff cannot show that the administrator abused its discretion in declining to calculate his pension amount using his bridged service, summary judgment will be entered in favor of Defendants.

It is therefore ORDERED that Plaintiff's claim for legal and equitable relief pursuant to 29 U.S.C. § 1132(a)(1)(B) be, and it is hereby, DENIED.

It is further ORDERED that judgment be, and it is hereby, ENTERED in favor of Defendant, and the Plaintiff take nothing by his suit.

SIGNED AND ENTERED THIS 4th day of October, 2011.

HARRY LEE HUDSPETH
SENIOR UNITED STATES DISTRICT JUDGE